KELLY AND LITTLE *v.* THE STATE, 3 Smedes & Marshall, 518.

## MURDER.

The caption of the indictment stated, that the court was held for the county of Smith, at the court-house, in the town of Raleigh; and the town of Raleigh, in Smith county, was incorporated, by act of the legislature, in 1838, and by another act of the legislature, passed in 1836, the county site of the public buildings of Smith county was located in what is now a part of the town of Raleigh; *held,* that the caption of the indictment sufficiently showed that the court was held at the place designated by law.

Numerical figures may be used in an indictment to express numbers and dates; if, however, they are illegible, the indictment will be bad for uncertainty.[1]

It is sufficient if the record shows that the jurors, who tried the defendant, were summoned by the deputy sheriff, his acts as such deputy being, in legal effect, the acts of the sheriff; and it cannot be objected to the verdict that the court *dismissed* the sheriff from the duty of summoning *tales* jurors, as such order or action of the court would be null and void.

Where a slave has been killed by his master and overseer, or either, in inflicting chastisement upon him, the rules of the common law, upon the subject of murder, will regulate the character of the offense.

Under the laws of this state, the master is liable to be indicted for an assault and battery upon his own slave, when he has inflicted cruel and unusual punishment on him; and it is for the jury to determine what constitutes such cruel and unusual punishment.

Intoxication may be a circumstance proper for the consideration of the jury upon the question of intention or malice on the part of the offender, but it is no legal excuse or extenuation of the crime.[2]

[1] State v. Peck, 165; Com. v. Adams, 1 Gray, 481; State v. Raiford, 7 Porter, 101; State v. Hodgeden, 3 Vermont, 481; State v. Seamon, 1 Iowa, 418; State v. Eagan, 10 La., 699; Cody v. Commonwealth, 10 Gratton, 776; Lazier v. Commonwealth, ib., 708; State v. Reid, 35 Me., 489; State v. Lane, 4 Iredell, 113; State v. Haddock, 2 Hawk., 461; State v. Dickens, 1 Haywood, 406; State v. Smith, Peck 165; Wharton's Am. Cr. Law, 408; *sed vide contra,* State v. Voshall, 4 Indiana, 590; Finch v. State, 6 Blackf. 533; Berrian v. State, 2 Zabriskie 9; though see ib., 679; in New Jersey this is corrected by statute; Johnson v. State, 1 Dutch., 313.

Pa. v. McGall, Add., 257; Swan v. State, 4 Humpt., 136; People v. Balencia, 21 Cal., 544; Mooney v. State, 33 Ala., 419; Golden v. State, 25 Ga., 527; Jones v. State, 29 Ga., 595; Keenan v. Commonwealth, 8 Wright, 55; Commonwealth v. Hawkins, 3 Gray, 463; State v. Harlowe, 21 Mo., 446; People v. Robinson, 2 Parker Cr. R., 235; People v. Hammill, ib., 223; Haile v. State, 11 Humpt., 154; U. S. v. Roundenbush, 1 Bald., 514; Pirtle v. State, 9 Humph., 663; State v. McCants, 1 Spear, 384; Cornwall v. State, Mart. & Yerg., 147; State v. Bullock, 13 Ala., 413; Wharton Am. Cr. Law, 41-4; Rex v. Crusoe, 8 C. & P., 541: 3 Greenl. Ev., 6148; Eastwood v. People; 3 Parker Cr. R., 25 (4 Kern, 526); Rogers v. People, ib., 632; 1 Russell v. Crimes, 8; Rex v. Grindley, Worcester Sum. Ass.. 1819 M.S.; Rex v. Carroll, 7 C. & P., 145, 32 Eng. Com. Law R., 471; Rev. Thomas, 7 C. & P., 817; Pearson's case, 2 Lewin, 145; Marshall's case, ib., 76; Goodier's case, ib.; Pigman v. State, 14 Ohio, 555.

[2] U. S. Clarke, 2 Cranch, C. C. R., 158; U. S. v. McClue, Curtis C. C. R., 1; People v. Pine, 2 Barbour, 566; State v. Bullock, 13 Ala., 413; State v. Stark, 1 Strob., 479; U. S. Cornell, 2 Mason, 91; U. S. v. Forbes, Crabbe, 558; State v. Harlow, 21 Mo., 446; Cornwall v. State, Mar. & Yerg., 147; Pirtle v. State, 9 Humph., 663; State v. John, 8 Ired., 330; State v. Turner, 1 Wright, 30; People v. Wilby, 5 Parker Cr. R., 19; Porter v. State, 12 Tex., 500; Mercer v. State, 17 Ga., 146; People v. Robinson,

Motions by the state, in the absence of the accuser, to quash the *venire facias* and for the issuance of an alias *venire facias*, made after arraignment and before trial, and which were overruled, will not vitiate the verdict of the jury.  The absence of the accused may have been the reason for overruling the motions.

Upon conviction of manslaughter, the prisoner must be present in court when sentence is pronounced; *without such presence, the sentence would be invalid.*‡

The sentence of the court, inflicting the punishment of imprisonment, must fix the date of its commencement, or otherwise it will be erroneous.§

Where the verdict of the jury, finding the accused guilty of manslaughter, is regular and valid, but the sentence of the court is erroneous, the judgment of the court may be reversed without disturbing the verdict, and the cause remanded with directions to the court below, to pronounce a correct judgment.

Error to the circuit court of Smith county.

At the April term, 1844, of the Smith county circuit, the grand jury found a joint bill of indictment against Kelly and Little for the murder of " Jack, a slave of said Kelly ;" and at the same term were tried and convicted of manslaughter in the first degree ; and were sentenced to confinement in the penitentiary for a term of seven years.  The indictment was in the common law form for murder, except that in the caption the grand jurors are not stated to have been sworn to enquire for the " State of Mississippi."

The bill of exceptions shows, that the special *venire* for the trial of prisoners and residue of the regular panel were exhausted, without obtaining the requisite number of jurors ; and thereupon the court being satisfied, as it alleged, that the sheriff " was grossly ignorant of his duties as sheriff," dismissed him from service in summoning *tales* jurors, and there being no coroner in the county, directed the sheriff to summon *tales* jurors.  The reason of this action of the court was, that the sheriff had summoned on the *venire* several of the grand jurors by whom the indictment was found, and also many of the original *venire*, and several of the jury of inquest.  Before this action was had, the district attorney moved the court to quash the special *venire*, and for an *alias special venire facias*, on the ground of partiality and corruption in the sheriff, in summoning

2 Parker Cr. R., 235 ; People v. Hammill, ib., 223 ; Smith v. Commonwealth, 1 Duvall, 224 ; Kenney v. People, 4 Tiffany, 330 ; Commonwealth v. Hawkins, 3 Gray (Mass.), 463 ; People v. Robinson, 1 Parker C. C. 649 ; Schaller v. State, 14 Mo., 502 ; Wharton, on Homicide, 369 ; Wharton Am. Cr. Law, 40–4 ; 1 Archbold Cr. Pr. & Pl., 31, et seq. ; see also note (1) p.      supra.

‡ Archbold Cr. Pr. & Pl., 277 ; notes.

§ Wharton v. State, 41 Miss. 680 ; Rex v. Kenworthy, 1 Barn. & Cress., 711 ; Rex v. Nichols, 1 Barn & Ald., 21.

improper jurors; but these motions were overruled by the court. The prisoners excepted to the discharge of the sheriff, and to the direction to the deputy to summon talesmen. The same was afterwards assigned as ground for the motion for a new trial, which was overruled; and for this the prisoners also excepted. It does not appear by the record that the prisoners were present in court when sentence was pronounced against them, nor at what time the punishment was to commence.

Motion in arrest of judgment, because,

1st. The indictment does not charge any offense known to the laws of this state.

2d. Because it is not stated in the indictment that the grand jury was empanelled, sworn and charged to inquire for the State of Mississippi. Motion overruled and prisoners excepted thereto. The jury who tried the case were "sworn to speak the truth of and concerning the premises." The prisoners asked the court to give the following instructions to the jury:

2. "There being no system of domestic slavery known to the common law of England, the relation of master and slave known in this state, as well as that between slave and overseer not having existed in England, there is nothing in the common law, on the subject of murder, that has strict and complete application to a case of killing, as arising from the chastisement of a slave by his master or overseer or both."

6th Instruction. "The first description of killing is the only one that the jury can regard as applicable to the present case." (This has reference to the description of the three cases of killing declared to be murder in the penitentiary codes.)

7th Instruction. In determining whether the act of killing was or was not murder, if the jury, find from the evidence that the defendants were in a state of serious intoxication, they are entitled to regard this fact as elucidatory to the point of intention, as evidence more or less strong, according to their view of the real circumstances of the case, as proof of the absence or that premeditated design required by our statute in the first description of murder, as stated in the 5th instruction, as an indespensable ingredient of murder.

9th Instruction. More especially if they entertain reasonable

doubts of the malicious intention with which the act was done, that doubt must weigh in favor of the prisoners, and the jury must acquit them.

13th Instruction.   " One who is indicted for murder cannot be convicted of manslaughter ; or if, on such indictment, the offense proved is involuntary manslaughter, the defendants should be acquitted ;" all of which 2d, 6th, 7th, 9th and 13th instructions were refused by the court ; and the prisoners excepted. It appeared by the record fully proved that the prisoners, at the time of the act charged, were both drunk.

On the part of the state, the court charged as follows : " That drunkenness is no excuse for crime, and that, in this respect, there is no difference between the common law and the law of this state ; that although the master has the right to chastise his slave, yet he is responsible for the proper and rational exercise of that right ; and if he exceeds the bounds of moderation, and punish in a manner which evinces a cruel and depraved mind, regardless of human life, and death results from such cruel, reckless and immoderate punishment, that is murder ; that if there be no other evidence of insanity in the accused but that kind of disorder of mind which is common to all men under the influence of ardent spirits, it is not such insanity as will excuse the commission of crime ; that if the death of the negro was the immediate and necessary result of the means employed by the accused, they are, in law, presumed to have intended his death ; that the statute of this state has not altered the common law in respect to drunkenness and insanity ; that, under the indictment, it is competent to the jury to find the accused guilty of manslaughter." To which the prisoners also filed their exceptions, and now prosecute this writ of error.

The prisoners assigned the following errors :

1. The circuit court erred in giving the order to James Sommers to summon *tales* jurors to be passed in chief as jurors, and in discharging and prohibiting the sheriff from performing that duty, as set forth in the first bill of exceptions.

2. The court erred in refusing to give the second instruction asked by the prisoners.

3. It erred in refusing the sixth instruction, so asked.

4. It erred in refusing the seventh instruction, so asked.

5. It erred in refusing the ninth instruction, so asked.

6. It erred in refusing the thirteenth instruction, so asked.

7. It erred in refusing to grant a new trial.

8. It erred in overruling the reasons assigned in arrest of judgment.

9. It erred in granting the instructions asked by the state, as set out in the third bill of exceptions.

10. The record does not show that the prisoners were put to the bar of the court pending trial, or at the rendition of the verdict, or at the time sentence was pronounced.

11. The sentence is uncertain in not showing any day at and from which the punishment should commence.

12. The record does not show in the caption that the court was held in the place designated by law.

13. The day and year in which the court was held, and the indictment found, is in figures; and the whole caption, in relation to the empanelling of the jury and the finding of the indictment, is in the past tense.

*Foote & Swann* for the plaintiffs in error.

The sheriff cannot be removed from office unless in cases specified in the constitution and laws. Const., art. 4, sec. 28; art. 5, sec. 19.

The persons summoned and objected to by the court were not absolutely disqualified by law to serve as jurors, so as to evince gross ignorance on the part of the sheriff. Rev. Code, 136, sec. 138. 1 How., 174 establishes the doctrine that all persons are qualified, in this regard, not specially excluded by the statute. If the sheriff was disqualified to act, there being no coroner, a justice of the peace should have been summoned for the occasion. How. & Hutch., 304, sec. 46. If the sheriff was incompetent, so was Sommers his deputy.

The prisoners had a right to that trial with all the forms of law, and administered by the appointed officers. How. & Hutch., 690, tit. 1, sec. 1. The statute requires the sheriff to summon talesmen. Acts 1833, p. 412.

3d Assignment. "Law of Slavery," 244.

5th Assignment. How. & Hutch., 722; 4 How., 168.

7th Assignment.    1 Russ. on C., 421, 428; Addison's Rep., 257.

8th Assignment.    1 Chitty's Crim. Law, 551.

10th Assignment.    How. & Hutch., tit. 2, p. 690, sec. 1, as to first ground; as to second, 2 Hale's P. C., ch. 23, 167; 4 Black. Com. App.; 4 Hawk. P. C., 76; 2 Keble, 471.

12th Assignment.    2 Hale's P. C., 293; 18 Johns., 212. Prisoner waives no right.    Lofft, 400; 1 Chitty's Cr. Law, 799, 712; 7 Cow., 525; 1 Wend., 91; 2 Ala. Rep., State v. Hughes.

For the following errors, which go to the foundation of the indictment, the prisoners ought to be discharged: It does not show in the caption that the court was held at the place designated by law. 2 Hawk. P. C., 350, sect. 128; Acts, 1836, p. 399; Acts, 1838, pp. 95, 96, sec. 2; also, Carpenter's case, 4 Howard.

2d. The day and year when the court was held and the indictment found are stated in figures; and the whole caption in relation to the empanelling of the jury and the finding of the indictment is in the past tense. This is not allowable. 2 Hale's P. C., 170; 2 Hawk, P. C. 360, sec. 127; Starkie's Cr. Pl., 269.

THACHER, J.:

This was an indictment preferred in the circuit court of Smith county against the plaintiffs in error for the murder of a slave, the property of the plaintiffs in error, Kelly, which, upon trial, resulted in a verdict of manslaughter in the first degree.

We shall proceed to notice such points made by the plaintiffs in error, which we deem to be at all in doubt.

The first objection insisted upon is, that the caption of the indictment does not show that the court was held in the place designated by law. It shows that the circuit court, at which the indictment was found, was held for the county of Smith, and at the court-house in the town of Raleigh. The town of Raleigh in Smith county was incorporated by act of the legislature, 1838, which is sufficient to authorize this court to take notice of it as a place within that county. 9 Yerg. R., 381, Hite v. State. By the act of 1836, the county site for the public buildings of Smith county was located in what is now a portion of the town of Raleigh. We think, therefore, the description in the caption is

made with reasonable certainty, and as much so as can be required to designate the place where the court was held.

It is objected to the validity of the indictment, that numerical figures are used in it to express numbers and dates. The rule in England restraining the expression of numbers by figures was not a regulation of the common law, but made by a statute which has since been repealed. There must be certainty in an indictment, in order to furnish a bar to another prosecution for the same offense. But figures are a part of the English language, and are admissible in indictments. 3 Vermont R., 431, State v. Hodgden. If, however, the figures are illegible, the indictment is bad for uncertainty.

The objection that the court below erred in dismissing the sheriff from the duty of summoning *tales* jurors, we think is ineffectual. Any such act or order was void, and it is enough that the record shows the jurors to have been summoned by the deputy sheriff, which in the eye of the law is the act of the sheriff himself.

Several points have been urged growing out of the refusal of the court below to charge the jury as requested by the prisoner's counsel.

1st. The court below declined to charge the jury as follows: "There being no system of domestic slavery known to the common law of England, the relation of master and slave known in this state, as well as that between slave and overseer, not having existed in England, there is nothing in the common law on the subject of murder that has strict and complete application to a case of killing, as arising from the chastisement of a slave by his master or overseer, or both." This instruction, we think, was properly refused. The system of slavery, as controlled by the laws of this state, is peculiar, and differs in some respects from the system in other states of the Union. It is unlike the system as it existed among the Jews, the Greeks, the Romans, and differs materially from the villanage of ancient England.

Among the Jews the death of the slave by whipping, under the hand of the master, was merely punishable by a fine. Exodus xxi. 20, 22. Among the Greeks, the young Spartans were occasionally compelled to kill all the Helots they could

VOL. I.—16.

meet, in order to prevent their great increase. Plutarch's Life of Lycurgus. Among the Romans there was an uncontrolled power by the owner over the life of his slave. Just. Inst. B. 1 tit. 3, § 3. In ancient England the life and limb of the slave were protected against his master, because, as Lord Coke says, 127 a, he was subject to the king,—" *Vita et membra sunt in manu regis.*" Yet in several other respects, his condition did not at all resemble the condition of the slave here. But in this state, the killing of the slave by the master, feloniously, is murder. Walker, R. 83, State v. Jones. By the statute H. &. H., 162, § 28, the master, or any other person entitled to the service of the slave, shall not inflict upon such slave cruel or unusual punishment, under the penalty, upon conviction thereof, of a fine of five hundred dollars.

In this state the master is therefore, under the above circumstances, liable to an indictment for a battery committed upon his slave. In the absence of similar legislation, it has been elsewhere otherwise decided. 2 Dev. R. 263; State v. Mann; 5 Raud. R. 678; Commonwealth v. Turner. But anywhere in this country the attempt to take the slave's life by the master, or any other person, feloniously, may rightfully be resisted by him. 1 Dev. & Batt. R. 171, State v. Will. Now, by the common law of England, masters were allowed to punish their servants with moderation. 1 Hale's P. C. 454. What was moderation at common law, was a question of fact for a jury who might be masters; and here, what is a cruel and unusual punishment, is likewise, in all cases, a question of fact for a jury who most generally are slave owners. It is not contended that a greater degree of punishment may not be inflicted here by the master upon his slave than by the master upon the servant at common law, because such here may be usual from necessity, but the same general principle of law holds in both cases, so that the court did not err in refusing the instruction.

2d. The court below declined to charge the jury as follows: "In determining whether the act of killing was, or was not murder, if the jury find, from the evidence, that the defendants were in a state of serious intoxication, they are entitled to regard this fact as elucidatory of the point of intention, as evidence,

more or less strong, according to their view of the real circum-
stances of the case, as proof of the absence of that premeditated
design, required by our statute in its first description of murder,
as an indispensable ingredient of murder." As, in this case, the
finding of the jury was manslaughter, no injury accrued to the
prisoners from the denial of the charge by the court. It is true
that our statute, H. & H., 722, § 2, has enacted, that no person
can be punished for an offense committed in a state of insanity;
but, in doing so, it has done no more, as all writers on criminal
law show, than to re-enact the common law. It is to be noticed,
that the instruction under review has reference only to a single
instance of intoxication, and has no reference to well-defined and
unmistakable insanity, produced by a long-continued or excessive
use of intoxicating stimulants. Legal writers, from the earliest
times to the present, agree, that mere drunkenness is no exten-
uation or excuse for crime in the view of the law. " He who is
guilty of any crime whatever, through drunkenness, shall be
punished for it, as much as if he had been sober." 1 Hawk. P.
C., 3. " A drunkard," says Lord Coke, " is *voluntarius dæmon*,
and hath no privilege thereby." Judge Story, commenting on
the same subject, says: " If persons wilfully deprive themselves
of reason, they ought not to be excused one crime by the volun-
tary perpetration of another." In this connection, it is insisted
by counsel that, as our statute, in one of its definitions of mur-
der, declares, that it must be perpetrated from " a premeditated
design to effect the death of the person killed, or some other
person," and as intoxication " steals away the brain," such is a
circumstance to infer the want or absence of a premeditated
design to commit a felonious act. The fact of the party being
intoxicated has, indeed, been holden to be a circumstance, proper
to be taken into consideration, where the sole question is, whether
an act was premeditated, or done only with sudden heat and im-
pulse. The same may as truly be said of the passion of anger,
or any other excitement arising from sudden provocation or pecu-
liar circumstances. But how slight that consideration should be,
in the instance of intoxication, is readily conceived from the as
equally just presumption, that the design to commit a crime may
have previously existed or been contemplated, and the intoxica-

tion have been employed " to screw the courage to the sticking place." Hence it is that the law discriminates between the delusion of intoxication, and the insanity which it may ultimately produce. For, if the mere fit of drunkenness is always to be held as an excuse for crime, there is at once established a complete emancipation from criminal justice. And, generally, to sustain a defense on the ground of insanity, a comparison of the best authorities concludes, that it must be clearly proved that, at the time of committing the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did understand them, that he did not know he was doing what was wrong.

In looking through the record, we observe, that in the interval, after the arraignment and before the trial, two motions were made in behalf of the State, and in the absence of the prisoners. These were motions to quash the special *venire facias,* and for an *alias venire facias,* and they were overruled by the court. These proceedings wrought no injury to the defendants, as they did not preclude them from preferring similar motions at the trial, had they so desired, nor does it appear, but that the two motions were overruled on account of the absence of the prisoners.

But it does not appear in the record that the prisoners were personally in court at the time of pronouncing the sentence. The presence of the prisoners is considered absolutely necessary, both in England and in this country, in all cases where judgment of corporal punishment is to be pronounced. 1 Chit. C. L., 695; 12 Wend., 344; 7 Cowen, 525.

Finally; the sentence or judgment of the court below is defective, in not setting forth the time from whence the commencement of the imprisonment shall date. This is generally from the day of the sentence.

For the two errors just pointed out, the judgment of the court below is reversed, without disturbing the verdict, and the cause remanded, with directions to the court below to pronounce its judgment in accordance herewith, having first duly required of the defendants whether they have anything further to urge why its judgment should not then be pronounced.